# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SEAN THORNE and ANTHONY CARTER, individually and as representatives of a class of similarly situated persons, on behalf of the SAP AMERICA HEALTH & WELFARE PLAN,

Plaintiffs,

v.

SAP AMERICA, INC., THE BENEFITS COMMITTEE OF SAP AMERICA, INC., and DOES No. 1-10, Whose Names Are Currently Unknown,

Defendants.

Case No. ________________

## CLASS ACTION COMPLAINT

Plaintiffs, Sean Thorne and Anthony Carter (collectively, "Plaintiffs"), individually and as representatives of the SAP America Health & Welfare Plan (the "Plan") and a proposed class ("Class," defined below) of participants and beneficiaries in the Plan, as and for their Complaint allege as follows:

## I. PRELIMINARY STATEMENT

1. Plaintiffs bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, on behalf of the Plan and the Class, against Defendants, SAP America, Inc. ("SAP"), the Benefits Committee of SAP America, Inc. (the "Committee"), and Does No. 1-10, who are members of the Committee or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breaches of fiduciary duty.

2. This action arises out of Defendants' failure to prudently and loyally monitor the healthcare coverage options in the Plan, to the significant detriment of the Plan's participants and beneficiaries. In violation of ERISA, Defendants: (1) failed to prudently and loyally select and monitor the Plan's preferred provider organization ("PPO") medical insurance option; (2) allowed the Plan's PPO 85 option to be financially dominated by the Plan's Consumer Choice 90 option; and (3) failed to disclose this material information to the Plan's participants. Recovery of all losses suffered by the Plan is sought for the period beginning six years before the date this action is filed and continuing to the date of judgment (the "Class Period").

3. Mismanagement of employer-sponsored healthcare plans has severe consequences. As of 2023, 53.7% of civilian Americans relied upon their employer or union for health insurance coverage.[1] This employment-based coverage is by far the most common type of

---

[1] Katherine Keisler-Starkey and Lisa N. Bunch, Health Insurance Coverage in the United States: 2023, U.S. CENSUS BUREAU (Sept. 2024), https://www2.census.gov/library/publications/2024/demo/p60-284.pdf (last visited Oct. 9, 2026).

health insurance coverage in the United States,[2] and along with retirement benefits, makes up 13% of total national compensation.[3] Americans also devote a substantial percentage of their annual expenditures to healthcare. In 2023, healthcare accounted for 8% of all consumer expenditures.[4] As such, it is crucial that each health insurance option offered by employers provides advantages to participants without needlessly wasting their money.

4. To this end, employers must confirm that no health insurance option is financially dominated by another, such that it is less advantageous to employees no matter the level of health care expenditure or services consumed. In economic terms, an option is financially dominated when it provides the same financial value to a consumer as an alternative yet costs more than this alternative. A health insurance option is financially dominated when there is another option that results in lower total expenses to participants (inclusive of premiums) irrespective of the amount of medical care received.[5] Simply put, the dominated option costs more but provides no additional benefit, regardless of level of spending or risk aversion.

5. In managing the Plan, Defendants have selected and maintained three primary medical plan options for U.S. employees, purportedly to address the diverse needs of SAP's employees: Consumer Choice 90, Consumer Choice 80, and PPO 85 (each individually a "Plan

---

[2] *Id.*

[3] Amy Monahan and Barak D. Richman, Hiding in Plain Sight: ERISA's Cure for the $1.4 Trillion Health Benefits Market (2025), YALE J. ON REG., (Vol. 42, No.1), at 237 n.1, 263-264 (the full cost of employer sponsored health insurance is a compensation expense that reduces wages accordingly).

[4] Consumer Expenditures – 2024, Bureau of Labor Statistics, U.S. DEP'T OF LABOR (Dec. 19, 2025), https://www.bls.gov/news.release/pdf/cesan.pdf (last visited Oct. 9, 2026).

[5] *See* Saurabh Bhargava, George Loewenstein, and Justin Sydnor, Choose to Lose: Health Plan Choices from a Menu with Dominated Options, THE QUARTERLY JOURNAL OF ECONOMICS (Vol. 132, Issue 3), at 1321.

Option" and, collectively, the "Plan Options"), each administered by Aetna.[6] Each Plan Option is a component of the Plan, which is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1). The Consumer Choice 90 and Consumer Choice 80 are high-deductible options that offer lower premiums, higher deductibles, and access to a Health Savings Account ("HSA") that receives employer contributions. The PPO 85 offers higher premiums and a lower deductible but does not provide access to an HSA. This action concerns SAP's continued maintenance of the PPO 85 option, which is financially dominated by the Consumer Choice 90 option across all levels of medical spending and for every coverage tier offered under the Plan.

6. The Consumer Choice 90 provides lower total costs across all levels of medical spending and for every coverage tier. Defendants have breached their fiduciary duties of prudence and loyalty by allowing the PPO 85 to be financially dominated by the Consumer Choice 90. Defendants should have determined and disclosed the dominated nature of the PPO 85 Plan Option, but either were unaware of or ignored this financial reality and failed to communicate material information to participants in the Plan, in violation of ERISA.

7. The different options in an employer-sponsored healthcare benefit program should offer employees a tradeoff—otherwise, there would be no reasoned basis to offer multiple options when certain options are never in the best interest of participants. An appropriately designed menu offering multiple health plan options offers a high-deductible option (with a lower premium) that is less expensive than a low deductible option (with a higher premium) at low levels of medical spend; but the high deductible option comes with a higher deductible and

[6] SAP also offers a Kaiser HMO option, available only to employees residing in California and Hawaii. Because the Kaiser HMO is subject to different plan parameters and is offered only to a geographically limited subset of participants, the financial-domination analysis herein is limited to the PPO 85 and the Consumer Choice 90.

higher out-of-pocket maximums, causing it to be more expensive than the low deductible option after the employee incurs a moderate level of medical bills. Instead, Defendants offer the Consumer Choice 90 option that provides lower total costs ***for all levels of medical spending***. This means the Consumer Choice 90 option financially dominates the PPO 85 option.

8. Defendants' management of the Plan's PPO 85 option is subject to ERISA's strict fiduciary duties. 29 U.S.C. § 1104. These duties are "the highest known to the law." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act with the "care, skill, prudence, and diligence" that a "prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A). Defendants have breached their fiduciary duties of prudence and loyalty by assembling a menu of options where there is *no* financial benefit to selecting the PPO 85 option.

9. Defendants are duty bound to disclose this to the Plan's participants, as fiduciaries are subject to "an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990) (similar). The Third Circuit likewise recognizes that a fiduciary has "an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993). But Defendants have failed to disclose such required information, in breach of their fiduciary obligations to participants. On the contrary, Defendants frame the choice between the Consumer Choice 90 and the PPO 85 as a tradeoff to be evaluated by comparing premiums, deductibles, copays, and out-of-pocket maximums, without disclosing that

the PPO 85 is always the more expensive option. For example, the 2026 Benefits Guide (the "Benefits Guide") tells participants that SAP's benefits are "designed to meet the unique needs of our diverse workforce so that you can select the benefits that meet your priorities and your budget," and presents the PPO 85 as offering a "[l]ower deductible" in exchange for "[h]igher per-paycheck contributions."

10. Offering a financially dominated option like the PPO 85 imprudently and disloyally shifts the burden from the employer to participants to determine the financial benefits of each option including the potentially dominated nature of the options—a task requiring a complicated mathematical computation—despite the informational asymmetries facing participants compared to Defendants. The consequences of Defendants' nondisclosure of the economic reality of the Plan Options are significant. In a 2017 study, researchers found that 61% of employees selected a financially dominated option when one was offered.[7]

11. The idea that individuals will knowingly enroll in a financially dominated option to achieve lower deductibles is contradicted by the economic research, which identifies a lack of literacy and understanding of complex insurance products as the overwhelming cause of this phenomenon. When the consequences of selecting a financially dominated option were shared with participants, researchers found this reduced the share of subjects choosing a dominated option to 18%.[8] With respect to the enrollment decisions of individuals with a high level of understanding of insurance, the research found that less than 2% chose a dominated option.[9] This underscores the importance of offering prudent, non-dominated health insurance options to

[7] *See* Bhargava, et al., Choose to Lose: Health Plan Choices from a Menu with Dominated Options, at 1321.

[8] *Id.* at 1325.

[9] *Id.*

participants, and of disclosing the dominated nature of an option where one is offered. Defendants have failed on both scores.

12. Defendants' decision to offer the financially dominated PPO 85 option and the failure to disclose its dominated nature to participants have resulted in the Plan and its participants paying wholly excessive and unnecessary healthcare expenses in the form of lost wages due to excessive premiums unaccompanied by any reduced out-of-pocket costs.

13. Based on this conduct, Plaintiffs assert claims against Defendants for breaches of the fiduciary duties of prudence and loyalty.

## II. THE PARTIES

14. Plaintiff Thorne is a resident of Glendale, Arizona. Plaintiff Thorne participated in the Plan from approximately November 2016 through May 2025. During Plaintiff Thorne's time as a participant in the Plan, he was enrolled in the "Employee + 1" coverage tier of the PPO 85 option. Plaintiff Thorne has been financially injured by Defendants' unlawful conduct, and his compensation would have been higher if Defendants had not violated ERISA as described herein. Throughout his enrollment, Plaintiff Thorne paid higher premiums through payroll deductions for coverage under the PPO 85 than he would have paid for the same coverage tier under the Consumer Choice 90, without receiving any offsetting financial or medical benefit.

15. Plaintiff Carter is a resident of Havertown, Pennsylvania. Plaintiff Carter is a current participant in the Plan and has been enrolled since approximately February 2021. During Plaintiff Carter's time in the Plan, he has been enrolled in the "Employee + 2" coverage tier of the PPO 85 option. Plaintiff Carter has been financially injured by Defendants' unlawful conduct, and his compensation would have been higher if Defendants had not violated ERISA as described herein. Throughout his enrollment, Plaintiff Carter paid higher premiums through

payroll deductions for coverage under the PPO 85 than he would have paid for the same coverage tier under the Consumer Choice 90, without receiving any offsetting financial or medical benefit.

16. SAP is a Delaware corporation headquartered in Newtown Square, Pennsylvania. SAP is the U.S. subsidiary of SAP SE, a global provider of enterprise business software solutions, and develops and delivers software that enables organizations to manage core business functions, including enterprise resource planning, human resources, finance, supply chain operations, procurement, and customer experience. SAP is the Plan Sponsor and Plan Administrator for the Plan. As the administrator of the Plan, SAP exercises discretionary authority or control with respect to the administration of the Plan and management and disposition of the Plan's assets, and is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

17. Upon information and belief, SAP delegated responsibility for the Plan's administration, including the selection and monitoring of the Plan Options, to the Committee. The Committee maintains its address at SAP's corporate headquarters in Newtown Square, Pennsylvania. The Committee and its members are appointed by SAP.

18. Upon information and belief, the Plan's governing documents vest the Plan Administrator and/or the Committee with discretionary authority to select, retain, and remove the medical Plan Options offered to participants and to determine the amount of employee contributions required for each Plan Option and coverage tier. In exercising that discretion each plan year, and in deciding whether to continue offering the PPO 85 on its existing terms, Defendants act as fiduciaries of the Plan, not merely as settlors.

19. Does No. 1-10 are members of the Committee and, by virtue of their membership,

as well as their maintenance and exercise of control over the assets of the Plan, are fiduciaries of the Plan. Despite reasonable and diligent efforts, Plaintiffs are currently unable to determine the membership of the Committee or the identity of the other fiduciaries of the Plan, as this information is not publicly available. As such, these Defendants are named Does 1-10 as placeholders. Plaintiffs will move, pursuant to Federal Rule of Civil Procedure 15, to amend this Complaint to name the members of the Committee and other responsible individuals as defendants once their identities are discovered.

## III. JURISDICTION AND VENUE

20. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C §§ 1109 and 1132.

21. This case presents a federal question under ERISA, and therefore the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). In addition, ERISA provides for nationwide service of process. *See* 29 U.S.C. § 1132(e)(2).

22. This Court has personal jurisdiction over Defendants and venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because SAP is headquartered, and the Plan is administered, in this District. In addition, this is the District where the breaches of fiduciary duty giving rise to this action occurred.

## IV. FACTUAL ALLEGATIONS

### A. SAP Sponsors the ERISA-Governed Health Plan

23. The Plan was established on August 1, 1988, and provides medical, dental, vision,

and prescription drug benefits, as well as certain other welfare benefits, to eligible employees of SAP. Employees who work 24 or more hours per week are generally eligible to participate in the Plan. The Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). Upon information and belief, the medical benefits offered under the Plan are self-funded by SAP, with Aetna serving as third-party claims administrator.

24. The Consumer Choice 90 and Consumer Choice 80 Plan Options include an HSA component that allows participants to save for future medical expenses on a pre-tax basis and also permits SAP to make certain contributions to the participant accounts. SAP contributes $600 annually to the HSA of a participant electing "Employee only" coverage under the Consumer Choice 90 or Consumer Choice 80, and $1,200 annually for all other coverage tiers of those two Plan Options, prorated based on date of hire. HAS funds may be used to pay the cost of qualified health care expenses as defined by the Internal Revenue Service. Any amounts contributed by SAP necessarily reduce the total amount paid by participants to receive healthcare benefits. Participants enrolled in the PPO 85 are ineligible for an HSA but may utilize a Health Care Flexible Spending Account ("FSA"). Like an HSA, participants with an FSA may still set aside pre-tax wages to pay for future medical care, but they do not get the benefit of any employer contributions made by SAP.[10]

25. Under the Plan, employees may elect coverage under one of the medical Plan Options and select a "coverage tier," which determines how many family members are insured and how much the coverage will cost. SAP offers four such coverage tiers: (1) "Employee only"; (2) "Employee + 1"; (3) "Employee + 2"; and (4) "Employee + 3 or more".

[10] As of January 2026, the maximum annual contribution to the FSA is $3,400. Any 2026 FSA funds not used by March 31, 2027 will be forfeited.

26. The PPO 85 requires significantly higher employee premiums across all coverage tiers than the Consumer Choice 90, which offers lower premiums (roughly half the per-pay-period cost of the PPO 85) and includes the employer HSA contributions described above. Although the PPO 85 features a lower annual deductible than the Consumer Choice 90, that difference is not large enough, at any level of medical spending or for any coverage tier, to offset the premium and HSA advantages of the Consumer Choice 90 Plan Option.

27. Critically, the PPO 85 and the Consumer Choice 90 provide access to the same Aetna provider network, cover the same medical services, and use the same prescription drug formulary. Both are administered by Aetna, and both provide 100% coverage for in-network preventive care without requiring a participant to meet the deductible first. The material differences between the two options are financial: premium amounts, deductibles, coinsurance rates, copayments, out-of-pocket maximums, and eligibility for an HSA or FSA. The PPO 85 Plan Option does not offer participants greater coverage or benefits than the Consumer Choice 90 Plan Option.

28. According to SAP's most recent Form 5500 filing, the Plan had 18,750 participants as of December 31, 2025.[11]

**B. Defendants Breached their Fiduciary Duties by Offering Employees a Financially Dominated Healthcare Option**

29. Defendants are, and have been throughout the Class Period, required to administer and manage the Plan in accordance with ERISA's strict fiduciary duties of loyalty and prudence, under which they are obligated to act solely in the interests of participants and beneficiaries and

[11] Form 5500 is the Department of Labor form on which the sponsor or administrator of an employee benefit plan governed by ERISA reports information concerning the participant demographics, qualification, financial condition, investments, and operations of the plan. *See* 2025 Form 5500 of the SAP America Health & Welfare Plan, at 2.

to employ a reasoned, prudent decision-making process in selecting and continually monitoring and evaluating plan benefits and expenses. These fiduciary obligations apply equally to welfare benefit plans, including employer-sponsored health plans, and require fiduciaries to identify and remove imprudent arrangements within a reasonable time.

30. Defendants breached their fiduciary duties to the Plan by offering the PPO 85 Plan Option, which is, across all levels of medical spending and for every coverage tier, financially dominated by the Consumer Choice 90 Plan Option, rendering all participants and beneficiaries enrolled in the PPO 85 financially worse off than they would have been in the Consumer Choice 90. Defendants further breached their fiduciary duties by failing to advise participants of the financial domination within the coverage alternatives. Indeed, offering a financially dominated option like the PPO 85 imprudently shifts the burden from the employer to participants to determine the financial benefits of each option at each level of spending, including the potentially dominated nature of the options, a task requiring a complicated mathematical computation to reveal.

31. As fiduciaries, Defendants are required to ensure that costs incurred by Plan participants are reasonable. *See Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). "Wasting beneficiaries' money is imprudent." *Hughes v. Northwestern Univ.*, 63 F. 4th 615, 627 (7th Cir. 2023) (internal quotation marks omitted). Moreover, even where participants select among the options a plan offers, fiduciaries "are required to conduct their own independent evaluation to determine which [options] may be prudently included in the plan's menu of options," and "[i]f the fiduciaries fail to remove an imprudent [option] from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 595 U.S. 170, 176 (2022). Participants' ability to choose among the Plan Options therefore does not excuse Defendants' retention of a

dominated option. *See id.* (rejecting reliance on "the participants' ultimate choice over their investments to excuse allegedly imprudent decisions").

32. Defendants are also obligated to disclose material information to participants. "The duty to disclose material information is the core of a fiduciary's responsibility." *Kenseth*, 610 F.3d at 466 (citing *Eddy*, 919 F.2d at 750). Fiduciaries have an obligation to not mislead, withhold, or misrepresent material information to participants as well as an affirmative obligation to disclose material information impacting interests of the participants. *See id.* at 466; *see also Bixler*, 12 F.3d at 1300.

33. Despite these obligations, Defendants failed to undertake the requisite prudent process to assess the full economic impact of the PPO 85 Plan Option offered to participants through the Plan. Defendants' decision to offer the financially dominated PPO 85 Plan Option, combined with their failure to disclose the dominated nature of that Plan Option to participants, has resulted in the Plan and its participants paying wholly excessive and unnecessary healthcare expenses. These costs equate to lost compensation by Plan participants due to excessive premiums without any reduced out-of-pocket expenses.

34. Defendants should have known that the PPO 85 was financially dominated. Each plan year, Defendants set and/or selected the premiums, employee contribution rates, deductibles, coinsurance rates, out-of-pocket maximums, and HSA contribution amounts for each Plan Option. Identifying the domination required nothing more than comparing the plan terms Defendants themselves set and/or selected. As alleged below, a straightforward comparison of each Plan Option's premiums, HSA contributions, deductibles, coinsurance, and out-of-pocket maximums reveals that the PPO 85 is more expensive than the Consumer Choice 90 at every level of medical spending and for every coverage tier. A prudent and loyal fiduciary

engaged in any reasoned review of the Plan Options would have identified this fact and removed the PPO 85, restructured its premiums or cost-sharing so that it offered participants a genuine tradeoff, or, at a minimum, disclosed its dominated status to participants.

35. Upon information and belief, because the Plan's medical benefits are self-funded, the excess premiums paid by participants enrolled in the PPO 85 funded Plan costs that SAP would otherwise have borne, reducing SAP's own cost of providing medical benefits. By retaining the dominated PPO 85, Defendants thus acted for the benefit of SAP rather than solely in the interest of Plan participants.

36. In a properly designed healthcare benefit program, participants who elect a high-deductible option should receive a meaningful economic benefit—typically through lower premiums, employer HSA contributions, or both—in exchange for assuming greater upfront financial risk, while participants who elect a low-deductible option pay more in premiums in return for greater first-dollar coverage and reduced cost-sharing. Consequently, under a properly balanced program menu, the lower premiums associated with the high-deductible option are expected to be offset by greater participant cost-sharing when healthcare services are utilized, while the higher premiums associated with the low-deductible option are expected to purchase meaningfully lower out-of-pocket costs. Absent this tradeoff, one option is economically dominated by the other and does not serve the interests of participants in any respect.

37. The Consumer Choice 90 Plan Option financially dominates the PPO 85 Plan Option; participants in the PPO 85 invariably pay more without any corresponding tradeoff or benefit.

38. To illustrate with a simplified example, for an individual obtaining "Employee only" coverage, the per-pay-period premium is $72.50 under the Consumer Choice 90 as

compared to $128.50 under the PPO 85—a difference of $56.00 per pay period in favor of the Consumer Choice 90 (over 26 pay periods per annum, the difference in annual premiums paid is $1,456). An individual enrolled in the Consumer Choice 90 also receives a $600 annual contribution from SAP to their HSA, which further widens the financial advantage of the Consumer Choice 90. Although the PPO 85's in-network annual deductible ($400 for Employee only coverage) is lower than the Consumer Choice 90's ($1,700 for Employee only coverage), that difference is not large enough, at any level of medical spending, to offset the Consumer Choice 90's premium and HSA advantages. Indeed, the Consumer Choice 90's in-network out-of-pocket maximum for Employee only coverage ($3,400, exclusive of premiums) is lower than the PPO 85's in-network out-of-pocket maximum for the same coverage tier ($3,500, exclusive of premiums), meaning the PPO 85 offers no offsetting advantage even for participants who reach the out-of-pocket maximum.

39. As depicted in the table below, this experience holds across all four coverage tiers offered under the Plan, with the Consumer Choice 90 offering meaningfully superior economic benefits to Plan participants, with no reduction in coverage, network, or benefits relative to the PPO 85.

PPO 85 vs Consumer Choice 90

| | **Annual Premiums** | | | **Out of Pocket Maximum** | | |
|---|---|---|---|---|---|---|
| | **PPO 85** | **Consumer Choice 90** | **Employer HSA Contribution** | **PPO 85** | **Consumer Choice 90** | **Difference in Total Medical Spend** |
| Employee only | $ 3,341 | $ 1,885 | $ 600 | $ 3,500 | $ 3,400 | $ 2,156 |
| Employee + 1 | $ 6,266 | $ 3,419 | $ 1,200 | $ 7,000 | $ 6,800 | $ 4,247 |
| Employee + 2 | $ 8,034 | $ 4,342 | $ 1,200 | $ 7,000 | $ 6,800 | $ 5,092 |
| Employee + 3 or more | $ 9,659 | $ 5,291 | $ 1,200 | $ 7,000 | $ 6,800 | $ 5,768 |

40. Not limited to scenarios in which the full out-of-pocket maximum is reached, the Consumer Choice 90 option financially dominates the PPO 85 option across all levels of medical spending, for every coverage tier. As a further example, and as shown in the charts below, an

employee enrolled in the Plan with the "Employee only", "Employee + 1", "Employee + 2", or "Employee + 3 or more" coverage tiers will spend more on the same exact medical care under the PPO 85 than under the Consumer Choice 90. This remains true regardless of whether a participant and their family incur no medical expenses, moderate medical expenses, or expenses sufficient to reach the Plan's out-of-pocket maximum, as illustrated below.

**Employee only**



**Employee + 1**




**Employee + 2**



**Employee + 3 or More**




41. Despite the common perception that PPO plans offer greater flexibility or protection for out-of-network care, the Consumer Choice 90 Plan Option's financial domination of the PPO 85 Plan Option persists when participants purchase out-of-network medical services. Across all coverage tiers and all modeled levels of out-of-network utilization, total annual participant costs under the PPO 85 remain higher than under the Consumer Choice 90. There is no level where the PPO 85 overtakes the Consumer Choice 90 as the less expensive Plan Option.

42. As shown in the charts below, an employee enrolled in the Plan with the "Employee only", "Employee + 1", "Employee + 2", or "Employee + 3 or more" coverage tiers will spend more on the same exact out-of-network medical care under the PPO 85 than under the Consumer Choice 90. This is true regardless of whether a participant and their family incur no medical expenses, moderate medical expenses, or expenses sufficient to reach the Plan's out-of-

pocket maximum, as illustrated below.

**Employee only**




**Employee + 1**



**Employee + 2**




**Employee + 3 or More**



43. No Plan participant benefited from enrolling in the PPO 85 instead of the Consumer Choice 90. Offering this financially dominated option, when the average Plan participant is unlikely (and should not be required) to be able to independently determine such domination exists, represents a severe breach of Defendants' fiduciary duty. Defendants' failure to communicate to participants the material information that participants' payroll deductions to pay the higher premiums of the PPO 85 provided no additional financial benefit over the Consumer Choice 90 (which had considerably lower premiums and included an HSA contribution) was a further breach of fiduciary duty.

44. The foregoing comparisons are based on the Plan Options' 2026 premiums and cost-sharing terms as set forth in SAP's benefits enrollment materials and the Plan Options' Summaries of Benefits and Coverage. They are conservative: among other things, they do not account for the tax advantages of HSA contributions, which further increase the Consumer Choice 90's financial advantage. The PPO 85 was likewise financially dominated by the Consumer Choice 90 for every coverage tier in each plan year of the Class Period.

45. Far from disclosing that the PPO 85 was financially dominated, SAP's enrollment materials presented the choice between the Plan Options as a genuine tradeoff. The Benefits Guide tells participants that SAP's benefits are "all designed to meet the unique needs of our diverse workforce so that you can select the benefits that meet your priorities and your *budget*," and that the Benefits Guide "provides information to help you evaluate your options." (emphasis added). Among other things, the Benefits Guide provides the following illustration of the purported tradeoff:




46. Nowhere does the Benefits Guide disclose that the PPO 85's lower deductible does not make up for its higher premiums and the HSA contributions its enrollees forgo, such that participants enrolled in the PPO 85 pay more than they would under the Consumer Choice 90.

## V. ERISA STANDARDS

47. As fiduciaries of the Plan, Defendants are subject to the strict fiduciary duties of loyalty and prudence that ERISA imposes. 29 U.S.C. § 1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A) for the exclusive purpose of

> i. providing benefits to participants and their beneficiaries; and
>
> ii. defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

48. Under ERISA, any party that exercises authority or control over plan assets, including the selection and retention of health insurance policies and service providers, must act prudently and solely in the interest of participants in the plan.

49. ERISA's fiduciary duties are the "highest known to the law," *Sweda*, 923 F.3d at 333, and must be performed with an "eye single" to the interests of participants. *Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995).

50. ERISA also imposes liability on plan fiduciaries for certain actions by their co-fiduciaries. Specifically, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

51. 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109, which provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109.

## VI. CLASS ACTION ALLEGATIONS

52. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Federal Rule of Civil Procedure 23.

53. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following proposed class ("Class"):

> All participants and beneficiaries of the SAP America Health & Welfare Plan enrolled in the PPO 85 option at any time on or after October 16, 2020, and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just.

54. **<u>Numerosity</u>**. Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States based on, *inter alia*, the participant counts reported in the Plan's Form 5500 filings. As a result, the members of the Class are so numerous

that their individual joinder in this action is impracticable.

55. **Commonality**. There are numerous questions of fact and law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

A. Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the participants of the Plan for the exclusive purpose of providing benefits to participants and their beneficiaries;

B. Whether the PPO 85 was financially dominated by the Consumer Choice 90 during the Class Period;

C. Whether Defendants knew or should have known that the PPO 85 was financially dominated;

D. Whether Defendants failed to disclose to participants material information regarding the PPO 85's dominated status;

E. Whether Defendants breached their duties under ERISA by engaging in the conduct described herein;

F. The proper form of equitable and injunctive relief; and

G. The proper measure of monetary relief.

56. **Typicality**. Plaintiffs, who are members of the Class, have claims that are typical of all members of the Class. Plaintiffs participated in the Plan as employees of SAP and were subject to the same PPO 85 option as other Class members. Plaintiffs' claims and all Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories applicable to all other members of the Class. In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable to all Class members.

57. **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of all Class members. Plaintiffs have no conflicts of interest with other Class members and no interests that are different from those of other Class other members. Plaintiffs have retained competent counsel experienced in class actions and other complex litigation, including ERISA class actions.

58. **Potential Risks and Effects of Separate Actions**. The prosecution of separate actions by individual Class members would create a risk of: (1) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (2) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

59. **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members. The Court and the parties will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages each Class member will recover, the calculation of which will ultimately be a ministerial function which does not bar Class certification.

60. **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty, such that they will never bring suit individually. Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.

Finally, individual litigation of multiple cases would be highly inefficient, a waste of the Court's and the parties' resources, and could potentially lead to inconsistent results that would be contrary to the interests of justice.

61. **Manageability**. This case is well-suited for class action treatment and can be easily managed as such since evidence of both liability and damages can be adduced and presented on a Class-wide basis while the allocation and distribution of damages to Class members will be essentially a ministerial function.

62. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty and other violations of ERISA described above. Accordingly, injunctive relief, legal and equitable monetary relief, and declaratory relief are appropriate with respect to the Class as a whole.

63. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Federal Rule of Civil Procedure 23(g). Moreover, treating this case as a class action is superior to proceeding on an individual basis, and there will be no difficulty in managing this case as a class action.

64. Therefore, this action should be certified as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), 23(b)(2), and/or 23(b)(3).

## COUNT I
## (Breach of Duty of Prudence Under ERISA Against All Defendants— 29 U.S.C. §§ 1104(a)(1)(B), 1109, 1132(a)(2)-(3))

65. Plaintiffs incorporate by reference the allegations in paragraphs 1-64.

66. Defendants are or were fiduciaries of the Plan under ERISA.

67. 29 U.S.C. § 1104 imposes a fiduciary duty of prudence upon Defendants in connection with the administration of the Plan and the selection and monitoring of the Plan's

healthcare options.

68. The scope of this fiduciary duty includes managing the Plan solely in the interest of its participants and beneficiaries and with appropriate care, skill, diligence, and prudence. Defendants are directly responsible for ensuring that each healthcare option within the Plan is reasonable, evaluating and monitoring the Plan's healthcare options on an ongoing basis, and removing imprudent healthcare options.

69. Defendants breached their fiduciary duties by offering a menu of healthcare options to participants of the Plan in which the PPO 85 Plan Option offered no financial or medical benefit to its enrollees when compared to the Consumer Choice 90 Plan Option.

70. A prudent fiduciary would have monitored premiums, deductibles, coinsurance rates, and out-of-pocket maximums of the various options to ensure that no option was financially dominated by any other option. Defendants failed to take these prudent measures to monitor the Plan's coverage alternatives to ensure that enrollees in the PPO 85 option received a financial benefit and, therefore, breached their duty of prudence to the Plan. Defendants likewise failed to remove the PPO 85, or to restructure its premiums or cost-sharing, within a reasonable time.

71. Defendants' fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost compensation.

72. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

**COUNT II**
**(Breach of Duty of Loyalty Under ERISA Against All Defendants—**
**29 U.S.C. §§ 1104(a)(1)(A), 1109, 1132(a)(2)-(3))**

73. Plaintiffs incorporate by reference the allegations in paragraphs 1-72.

74. Defendants are or were fiduciaries of the Plan under ERISA.

75. 29 U.S.C. § 1104 imposes a fiduciary duty of loyalty upon Defendants in connection with the administration of the Plan and the selection and monitoring of the Plan's healthcare options.

76. The scope of this fiduciary duty includes carrying out the management of the Plan for the exclusive purpose of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Defendants are responsible for monitoring the Plan Options to ensure the inclusion of each Plan Option in the Plan's menu of coverage options is in the best interest of Plan participants.

77. Defendants' fiduciary obligations also require the communication of material facts to participants when it is known that Defendants' silence may be harmful to participants, whether or not the participant asks for this material information.

78. The duty to disclose material facts to participants is an additional requirement that arises under the general fiduciary duties imposed by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

79. Defendants breached the duty of loyalty by failing to monitor and retain coverage options in the best interests of Plan participants *and* communicate and disclose to participants that the PPO 85 option offered no financial benefit to participants in comparison to the Consumer Choice 90 option despite having knowledge, or otherwise being required to have knowledge, of this material fact.

80. Defendants' fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief as provided by ERISA. *See* 29 U.S.C. § 1109(a), 1132(a)(2)-(3).

**COUNT III**
**(Failure to Monitor Co-Fiduciaries Against SAP—**
**29 U.S.C. §§ 1105, 1109, 1132(a)(2)-(3))**

81. Plaintiffs incorporate by reference the allegations in paragraphs 1-80.

82. SAP is a fiduciary of the Plan with responsibilities relating to the selection and monitoring of the Plan's healthcare options.

83. SAP is responsible for appointing and removing members of the Committee. SAP may additionally delegate its fiduciary responsibilities to any other person, persons, or entity. SAP therefore has a fiduciary responsibility to monitor the performance of the Committee and any other person, persons, or entity not named in the Complaint to whom SAP has delegated such fiduciary responsibilities.

84. A monitoring fiduciary must ensure that its appointed fiduciaries are performing their fiduciary obligations, including those with respect to the administration of the Plan, and must take prompt and effective action to protect the Plan and its participants when they fail to perform their fiduciary obligations in accordance with ERISA.

85. SAP breached its fiduciary monitoring duties by, among other things:

a. Failing to monitor and evaluate the performance of the Committee and any other delegated fiduciaries not named in the Complaint or have a system in place for doing so, standing idly by as Class members incurred significant losses as a result of the imprudent actions and omissions of the Committee and any other delegated fiduciaries not named in the Complaint;

b. Failing to monitor the processes by which the Plan's healthcare options were selected, monitored, and retained, which would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above;

c. Failing to monitor the processes or systems of communication by which the Committee and any other delegated fiduciaries not named in the Complaint used, or failed to use, to convey material facts to participants of the Plan; and

d. Failing to remove the members or any other delegated fiduciaries not named in the Complaint whose performance was inadequate in that they selected and retained imprudent healthcare options for the Plan, all to the detriment of the Plan and its participants.

86. As a consequence of the foregoing breaches of the duty to monitor, participants of the Plan suffered millions of dollars in lost wages by way of excessive premiums that provided no additional financial or medical benefit.

87. Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), SAP is liable to restore to the Plan and its participants all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries to the Plan.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(1), 23(b)(2), or 23(b)(3);

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that Defendants have breached their fiduciary duties and other obligations under ERISA;

D. An Order compelling Defendants to make good to the Plan all losses

resulting from their breaches of fiduciary duties and other violations and to restore to the Plan all profits Defendants made through use of the Plan's assets and compensation the Plan's participants would have retained had Defendants fulfilled their fiduciary obligations and other responsibilities to the Plan;

E. Surcharge, including surcharge payable directly to Class members in the amount of the excess contributions they paid for coverage under the PPO 85, and other equitable relief to redress Defendants' unlawful practices and to enforce the provisions of ERISA as may be appropriate;

F. An Order requiring Defendants to disgorge all profits received from the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants necessary to effectuate said relief and prevent Defendants' unjust enrichment;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated to participants in proportion to the Plan's losses attributable to them;

H. An Order enjoining Defendants from any further violations of their fiduciary responsibilities, obligations, and duties under ERISA, including an order requiring Defendants to remove or restructure the PPO 85 or, at a minimum, to disclose its dominated status to participants;

I. Other equitable relief as may be appropriate to redress Defendants' illegal practices and to enforce the provisions of ERISA, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries who are deemed to have breached their fiduciary duties;

J. An award of pre-judgment interest;

K. An award of costs pursuant to 29 U.S.C. § 1132(g);

L. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

M. Such other and further relief as the Court deems equitable and just.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 16, 2026

*/s/ Alec J. Berin*
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: ajberin@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
lrubinow@millershah.com

*Attorneys for Plaintiffs, the Plan, and the Proposed Class*